Mr. Kaczynski, you may proceed. May it please the Court. I want to start off by referencing two documents that I think are particularly significant in this case. And the first one is a transcript of a video that appeared on A&E Network in 1992, featuring the two producers of Top Gun, the original, and also the producer of Top Gun, Mambarek. And that's the legendary Jerry Bruckheimer and Don Simpson. And they talk about it. This is 1992, a few years after Top Gun has been released and was a great hit. And they explain how they came to make this movie. And you can see the transcript at 2ER281 if you want to follow along, or you can take my word for it. And so the story is that Jerry Bruckheimer goes in to see Ed Simpson, and Simpson is on the phone. And so to while away the time, Jerry Bruckheimer picks up a magazine, California magazine. Now why California magazine? California magazine at the time was a bastion of what we call the new journalism. And that was the idea that you tell a story, a true story, but you tell it in artistic terms. You don't tell all the facts, you tell the facts that matter, you tell them in colorful terms. You essentially make a story that is fun to read and interesting to read. And he picks up this story, and he is transfixed. He's sitting there reading, and Don Simpson, who is on the phone, supposedly talking to somebody, says, his eyes get like ginormous. And he looks at this thing, his eyes get like ginormous. So Simpson hangs up the phone, and he says, reads this, and he says, we got to get this. We got to buy this. He says, get on the phone with California magazine. We want this right away. So why? I mean, so the district court decided this under the extrinsic test based on the lack of objective similarities between the works. So why is Mr. Bruckheimer and Mr. Simpson's subjective view of how the article inspired them relevant to assessing the objective similarities? Well, this goes to two points. One of them is their reaction in reading this article, and these are experts, of course, in the field. And they read the article, and they don't say, oh, these are a bunch of facts. Let's go out to Miramar and get the facts and get a story. What they want is a story. So they explain. They explain why. What grabbed me was the colorful incidents, the colorful anecdotes, the characters, these guys' names like Hollywood, Yogi, Possum. And our expert, Henry Bean, explains why this matters, why he's not, Yonet is not talking facts, but he is describing his facts on the ground, but through a lens of the new journalism. Let me ask you a question about that, and put aside Judge Miller's question about whether their subjective views make a difference. Is the original film, which I'll call Top Gun, at all relevant to this case? Of course.  Well, the film built the characters that, based on the... But your claim is that the copyright in the article was infringed, correct? I'm answering your question. Yeah, I understand, but I'm trying to focus. The film is based on the story, and it lifts certain things. So, let's assume for a moment that... And those things... I'm sorry, I didn't mean to finish. I really was getting to your answer. I know, I understand. So, they lift certain things. They lift the flyers, the team, the use of the names, the use of the nicknames, the location, the way the sky, and the sun, and the sea are portrayed, the small town, 1950s small town site is for the base. All of those things get put into a 1970, a 1986 film, and they get carried forward to Top Gun Maverick. Many of them get carried forward. Most of them get carried forward. Some of them that are mentioned in the article are not even mentioned in the movie, and they get carried forward. Like the F-15, the F-14, that it swings back its wings so that it can do a short takeoff. Not mentioned in the... But that's a fact about the F-14. It really does do that. It's a real plane that has a swept wing design. Everything, everything, everything, and that was a district court's view, that everything is fact. Well, not, I mean, so not everything is fact. As I recall, the article said something about it, the wings sweep out like an eagle, or something like that. Like, that's a very evocative phrase, like that's creative and original and totally protected. But that's not in the movie. The movie doesn't use that phrase. The movie just uses the basic fact that the wings can go in different configurations. It does say for short takeoffs. It does say, the article does say for short takeoffs. But that's, that's also a fact about why, I mean, that's a... And you've got the bell that is mentioned in the article. They buy a bell to put in the bar to ring in case somebody violates the rules. Not mentioned in the movie. It becomes a big point in the sequel. All of these themes get picked up. The world that Yonei created in his article, the world that he created in California Magazine using the new journalism, gets transformed into the movie and then gets then moved forward with, into the maverick that T.C.M. Can I ask you, I still want to get back to Top Gun. And I'm still having some difficulty fitting its relevance into this case. Had Top Gun never been made, would you have the same claim? Seems to me you would. You're saying, you're saying there's an article and they, the movie is... And they bought it, they paid for it? No, no, put aside, put aside whether Top Gun was made or not, or whether they paid for it or not. You have a copyrighted article and then you have a movie, Maverick. And your claim in this case is that Maverick infringes the copyright of the article, correct? Yes. Not that Top Gun infringes the copyright, because they had permission to do it. I'm sorry, I may have misunderstood. Top Gun does not infringe the copyright because they had permission to... They had a license. They had a license. Again, tell me why Top Gun is at all relevant to this case. It sounds evocative to say that Maverick is a sequel, and the sequel must have... A legacy sequel. A legacy sequel, whatever you call it, and must have followed from the first. And since they got a license for the first, they must have needed one for the second. But there's no case law that actually says that. And so isn't our job to compare the similarity of Maverick to the article and forget all about Top Gun? Well, we can't forget about Top Gun. Well, I can. I mean, you can't, but I can, shouldn't I? Well, I mean, you can, because everything that I've said about Top Gun, or most of it, can be said about Top Gun Maverick. Okay, and that's what I'd like you to get to. Tell me why Maverick... I was just explaining, and I think the significance of the interview is that it happened right then. It happened after Top Gun, but everything they say there can be said about Top Gun Maverick. But we know they used the article. And again, remember, this is an important policy that Congress adopted in 1976, years before this contract was written, that when copyright owners sell a copyright for a small price, and it winds up being fabulously successful, they have a right, and Congress thought about this for 20 years, passed a statute that says they are entitled to get back the copyright, and the licensee gets a two-year exclusive period to negotiate for a license. In this case, they refused. We gave them notice, and they refused to even talk about it. They just plowed ahead. I agree with your recitation of the law. What I want to focus on in this case, and what I'm having some difficulty with, is why Maverick is substantially similar to the article. And focusing simply on Maverick, can you tell me why you think there's enough substantial similarity to create a jury question? Not on what people said in 1999. I'm just comparing the two works. I understand fully. It's fully explained in our expert report, and we need to talk a little bit about the totally insubstantial way that the district court dismissed our expert report. He explains things that came from the article directly to Top Gun Maverick, some that came through Top Gun, and it's all laid out. But I'll give you examples. The very fact of the school, the discipline that they engage, the pace of having high intensity flying, and then times when they party hard. The tension between trying to be the best, and trying to compete against your colleagues, and having them be sort of competitors, but also being a team. That is a theme. The idea that you're flying, you're flying through, and this is mentioned in the article and not in Top Gun, flying low to the ground between mountains and valleys, that appears only in Top Gun Maverick. It does not appear in the dangers of it, and how exciting it is. Pulling G's is discussed very substantially in the article. In fact, the author actually goes in and pulls some G's himself. Not very much talked about in the movie, but in Top Gun Maverick, one of the aviators, one of the pilots, actually passes out from the G's, which is mentioned in the article, and is almost crashed, almost crashes to the ground, because he loses consciousness. Can I ask you a question about the level of generality at which we're supposed to evaluate the similarities? Just to take one example from your brief, the article describes the community of pilots who are training in Top Gun as like King Arthur's Round Table, the gathering of the greatest of the greats in fighter aviation. That's clearly a creative, original, very evocative phrase. That's protected. That's not in the movie at all. In your brief, you say, and I think this sort of parallels what the brief does on a lot of other points, you say, well, okay, but what that phrase evokes is the idea that these are sort of an elite of aviation, and the movie depicts them as an elite in aviation, and so that's a similarity. And that is a similarity, but it's a similarity at a level of abstraction where it's just a fact that the Navy Fighter Weapons School represents the elite of aviation. So you've... It seems like what is original and protected is not similar, and a lot of the similarities are of things that are so abstracted as not to be protected. So what's your response to that? Well, the... First of all, you can't exclude all facts in a situation like this where the story is based on facts and then becomes a drama. I mean, the facts are sort of inherited. It's the way you describe the facts. You don't describe them as... You can say they're a bunch of aviators, but portray them as the knights of the king Arthur's table. That is a view, that's a description of the way the facts... That is not reality. That is a description. And, you know, we are now living in 20... This movie was released in 2022, and our notions of what is a trope or what is a standard affair is shaped by the intervening 36 years. If you go back to 1986, the kind of thing that you are talking about, Judge Merrill, was not widely known. And our expert talks about that, says this opened up and changed the article and the movie, changed our perception of how things operate. Nobody knew about these schools. Nobody knew about these aviators. It wasn't widely... I mean, nobody, I mean, the military knew, but the public didn't know. And the very success, the blockbuster success of the film was a... changed the trope. And we have a case law that says, the case involving the Pirates of the Caribbean, said you can't look. The Pirates of the Caribbean was made 20 years earlier. You have to look 20 years earlier because our perception of how pirates operate and that whole Caribbean situation is shaped by the movie itself. I do want to... I know I'm short on time, but I do want to mention the other document. You're actually over your time, but we will give you a couple of minutes for rebuttal. Do you want to just identify the other one in the record? Well, I want to talk about the Scripter Award because just during this litigation, UNC, with the help of Paramount, with some input from Paramount, nominated the film as based... nominated the film for a Scripter Award, which is an award given only for works from another medium, specifically a magazine article or a book. They sent this to Paramount. They sent it to a fellow by the name of Russell Nelson who sent it to everybody under the sun. Dozens, scores of people at Paramount. And nobody objected. And they... Are you making an estoppel argument based on... I'm sorry? Are you making an estoppel argument based on... Estoppel? Estoppel. Are you saying that they're estopped from denying similarity? No, no, no. We're saying this is an adoptive admission. This was... The nomination was for Top Gun Maverick based on characters for the 1983 California magazine article Top Guns. He sends it out. And then he gets back... He gets back emails saying, this is really good. And then this is from Jerry Bruckheimer. Joseph Kosinski got it. And then somebody else says, yes, spoke to Jerry. He's good. We will argue, we believe a trial, this is admissible as an adoptive admission that admitted that in fact the characters in the movie are based on Yone's article. And that's all we need. Because substantial similarity, if you take the characters, just take all of the characters in Harry Potter and put them in France and put them from school, you've taken everything. So just taking the characters alone is enough substantial similarity to support a jury verdict and therefore gets us way past the... Could you give me the ER site for that? I'm sorry? Give me the ER site for that document. This document, could you give me the ER site for it? Oh, yes. The email that I mentioned is 2ER270. Thank you. So the outgoing email that shows the list of recipients is at 2ER67. And then the document with the replies from Mark Weinstock, this is really a good sign. And then David Wallman spoke to Jerry. He's good. BAFTA tomorrow. Nobody objected. Tons of people were there. Nobody objected. Now eventually they caught on that this would interfere with their case and they withdrew the nomination. But the damage was done. Thank you. You're well past your time. Can I still have... We will give you two minutes for rebuttal. Thank you. Ms. Lenz. Good morning. May it please the Court, Molly Lenz on behalf of Paramount Pictures. I'd like to start by quickly addressing the USC Scripters Award, which is where counsel ended. With respect, if the court were to look at the actual record, it particularly would be the USC Scripters Award.       It portrays a very different story than that just represented. USC reaches out to Paramount, asks Paramount if they wish to submit the film for consideration. Paramount says, yes, of course we'd like to submit it, provides the actual credits to the movie with the characters attributed to the screenwriters from the first film. Article not mentioned. USC, for reasons unknown that are not in the record, decides to attribute the characters to the article. That is a mistake by USC. That cannot be attributable to Paramount and certainly cannot change whether the works satisfy the extrinsic test. So there is a copy and paste error by Mr. Nelson, which the plaintiffs are trying to capitalize on. Mr. Nelson did submit a declaration in the record before the district court. Good point, Your Honors, to that declaration. But the record is clear that it is just that, a mistake by USC and nothing more. And again, the focus of the extrinsic test is the actual works, not what USC erroneously may have attributed. If the plaintiff's expert had not been excluded, would summary judgment have been appropriate? Yes. I understand the judge didn't say that. The judge just excluded the expert and therefore said you don't have any expert evidence on the extrinsic test. But let's assume that the report was admitted. Why wouldn't that create a fact issue? Because dueling experts, by definition, don't create an issue of fact. We've got lots of case law that says one way to figure out whether there's an issue of fact on the extrinsic test is to get expert testimony about substantial similarity. And they proffered expert testimony. Had it been admitted, why wouldn't that have been enough to get them to a jury? Well, so a couple points, Your Honor. I don't think that this Court has ever said that expert testimony is required to get past summary judgment. No, I understand. We haven't said that, but we've said it's a useful tool. It's a fact to be considered. They have an expert. His qualifications are not being attacked. Who says these two things, the article and the maverick movie, not Top Gun, are substantially similar. The judge excludes the expert because he doesn't think he's got reliable methodology. I'm asking you to assume that the judge erred in excluding him. In that case, why wouldn't this case go to the jury? Because the expert's testimony doesn't change the ultimate nature of the works, Your Honor. So the Court has said that expert testimony may be useful in particular cases. Again, just to reiterate, the Court has never said that experts are required. This Court has also repeatedly held that the summary judgment standard on substantial similarity is exactly as Rule 56 says. It's not a different standard. The plaintiff here bears a burden to show a material issue of fact with respect to substantial similarity. The plaintiffs also bear the burden to the extent that they contend that they required expert testimony. It was their burden to put forward an admissible expert. This Court reviews the District Court's decision to exclude the proffered expert under an abuse of discretion standard. Rule 702, as well as the Daubert case, repeatedly affirmed that it is the plaintiff's burden to satisfy that the expert that they put forward... And I think you're missing my question, and this is why it's probably not phrased well enough. I understand that the decision about whether or not to admit an expert declaration or expert testimony is a discretionary decision under Rule 702. I'm asking you to assume that the judge erred in excluding this expert. Now, if we look at his declaration, don't we review de novo whether it creates an issue of fact, not under a more deferential standard? You do. However, the... So I will address the actual substance of Mr. Bean's report in a second. I will say that there is ample precedent by this circuit with respect to disregarding even experts that were not excluded at the summary judgment stage with respect to substantial similarity. The Fox v. Rice decision, this Court affirmed summary judgment upholding the decision by the district court to disregard the expert reports when the court engaged in its own extrinsic analysis. I don't want you to spend a lot of time telling us things we already understand. I'm still trying to figure out why this declaration, if accepted, doesn't create an issue of fact. Because Mr. Bean opining that things like the bell create issues of substantial similarity does not make that the case. This Court is required, just like the district court was, to consider the works actually before it. The fact that Mr. Bean opines that the fact that historically it might have been the case that the Wolfpack squadron acquired a bell while on an overseas tour and decided to hang it in a bar when they got back, first of all, that's a fact that needs to be filtered out regardless of whether Mr. Bean did it. But two, the fact that Mr. Bean says, quote-unquote, it's the same bell in both the article as well as Top Gun Maverick doesn't make it the same bell. We know it's a fact that needs to be filtered out. Even ignoring that, the bells are used in entirely different ways in the two works. In Top Gun Maverick, we have a bell that's already been hung in an established bar. It is used repeatedly to invoke the rules of the bar with respect to Pete Mitchell, Captain Pete Mitchell Maverick putting his cell phone on the bar just because Mr. Bean opines that they're the same doesn't mean that that's a fact that this court has to accept. Otherwise, the rule would be different for cases involving substantial similarity on summary judgment. And it can't be that motions to dismiss can't get decided because the court decides that experts may be helpful. The plaintiffs are then given an opportunity to proffer a helpful and reliable expert. And then simply if they come up with any expert who's been willing to parrot their views, that the court has to accept that as true, and then it creates a fact. Your position is that the substance of his declaration was insufficient to create a fact? Absolutely, Your Honor. Okay, but my difficulty with that, I'm not sure it's a terrible one, is that the district court never addressed the substance of his declaration. The district court just simply said this is not a qualified report. Is that something we should address in the first instance? With all due respect, I think that's a little bit unfair to the district court. The district court says three things with respect to Mr. Bean's report. One, he says that he failed to filter facts, and therefore the report is essentially infected with that infirmity, and the court can take just a cursory view with respect to Mr. Bean's report and know that that's the case. Mr. Bean actually says that's the case on the very first page of his report where he says that he was, quote unquote, trying to find any similarities with respect to the works. That that infirmity infects the entire report makes it not only unreliable, but also unhelpful to the court whose task, as we know under this court's precedent, is to first filter the unprotectable elements in it. Second, the district court finds that Mr. Bean also approached his analysis through the entirely wrong lens. He reviews the report for how it makes him feel, what the work evokes in him. So, for example, he concedes under, when he's examining purported similarities of dialogue, Mr. Bean says, well, it might be true that the dialogue, to the extent that the article actually has any dialogue, which are, of course, quotes from real people. Leaving that aside, Mr. Bean admits no similarity, no actual overlapping dialogue between the two works. Nevertheless, he says, well, it evokes the same feeling and creates the same world as that in the article, as in Top Gun Maverick. That's not the extrinsic test. That's not the analysis before the court. So the district court looks at those two problems which infect the entire report and concludes under Rule 702 that those two things led to lots of errors and make it inadmissible under 702. I think the reason that Mr. Bean's trying to find any similarities between the works, and two, he's approaching it from how does it make him feel, which is, of course, the intrinsic test, which is exclusively the province for the jury, means that Mr. Bean identifies entirely fabricated similarities between the two works. In addition, it's not helpful because Mr. Bean doesn't even bother to provide the court with a single page citation to the article, much less any timestamps as another infirmity to go back to your question originally about why are we talking about Top Gun Maverick. The majority of Mr. Bean's report is talking, excuse me, why are we talking about the 1986 film? Mr. Bean spends most of his report talking about the similarities between the 1986 film and the article, but we know that there's no claim of infringement between the 1986 film and the article. The only analysis before the court is properly whether Top Gun Maverick infringes the copyright of the article, and to answer your question, the fact that there is an interim derivative work doesn't change this court's analysis. The Copyright Act itself answers that question. Section 103B of the Copyright Act provides that the copyright in a derivative work, here being the 1986 film, quote, does not affect or enlarge the scope of the copyright protection in the preexisting material. We are examining whether the article infringes, excuse me, whether Top Gun Maverick infringes the copyright in the article without regard to the 1986 film, and of course, the 1986 film and Top Gun Maverick, yes, Maverick is a sequel. It picks up 30 years later, continues the career of the character Maverick, as the title suggests. The fact that Maverick is a derivative work of Top Gun 1986 doesn't mean that it's a derivative work of the article. Counsel? I have a question. My understanding is that the facts and ideas are not protected, but then when looking for similarities, we can look at similarities in themes, mood, setting, pace. I'm trying to understand what the difference is between the ideas and the themes. Where would we draw a line between ideas, you know, making a movie about Top Gun pilots versus the themes of the movie, which may be something that we could consider? So we know that ideas are not protected. And so themes, you know, there's certainly also where the level of abstraction, I think, is an interesting, potentially an interesting question with respect to certain works, but not one that the court needs to wade into here. I mean, fundamentally, these are the themes and the ideas of these, so even take the ideas, right? The article itself is a nonfiction article which focuses on the training program that Top Gun pilots go through and uses that as a launching point to discuss things like the reasons why Top Gun was created, certain features about the planes, and I would like to go back to the discussion of the F-14 if I have time, but the Top Gun maverick itself doesn't even share the idea, much less the themes beyond the school itself, and the school quote-unquote, in Top Gun maverick has Top Gun graduates. If I understand you correctly, you're saying that there's no similarity in themes between maverick and the article? Correct. But I guess I'm still fuzzy on what we're calling, what's the definition of a theme versus an idea? Well, I think a theme is sort of the lesson, if you will, the takeaway from the work, and so the themes that... Give me an example of a theme of the article and a theme of the movie. Yes, so the plaintiff argues that the themes of the article are the aviation caste system, the anachronism of fighter aviation, and post-war nostalgia that yearns for a simpler America. I don't think those are actually themes of the article, but even if we were to accept that as true, maverick's themes, which is not disputed, are themes of guilt, reconciliation, and redemption. So we see the character of Maverick, right, who's got a stalled 30-year career due to insubordination and a strange relationship with the rooster character. He repairs his relationship with Penny, and by the end of the movie he has redeemed himself not only in the eyes of the military, which distrusted him, he's repaired his relationship with Rooster, and he's also repaired his relationship with Penny. None of those themes are present. So I would say ideas are more like, let's do a movie, let's create a work about Top Gun, as opposed to thematic or sort of message. I have the same difficulty Judge Sung was expressing, at least, which is that I'm not sure how we define a theme. The case law doesn't tell us how to define a theme. We can define arrangement because we can look at where they are in the work, but it seems to be a lot of here what we're doing is saying a theme is what we call the theme. In retrospect, I'll back and look at the first one and say the first one's theme is X and the second one's theme is Y. And I'm trying to figure out how, as judges, we're supposed to figure out what a theme is. Well, I don't know that this is the case you need to decide it in because, again, even if you accepted Mr. Bean's report, the themes that he identifies, one, are not actually themes. I don't think a theme can be found in a solitary sentence in an article, for example, which is what he tries to do. He tries to find, like, he says this is a paragraph in this. That's a theme. That's, by definition, we all know what a theme is. Like, a stray sentence here or there is not a theme. And, again, in any event, what he points out as purported themes in the article are just manifestly not themes of top-down matter. One theme he identified that I think you haven't mentioned is they both follow the recurring theme of the redemption of a hero who is thwarted by his limitations but finally overcomes them and triumphs. Do you think that's protectable as a theme? No, I don't think that. I think that's too abstract and too general. Nobody can own that. I should be able to create stories about a hero who overcomes a challenge. Not to mention you have to look, and the case law tells us this, like the Binet decision, you have to look at how the works convey and explore those themes. You don't just hunt and peck to try to find things that you think are similar. Again, we're really stretching things to try to argue that the article has a theme of overcoming an obstacle. All we're told is that the yogi and possum fail one of their simulated exercises, quote-unquote shrug and go out for a beer, and then later graduate successfully from the program. That is not overcoming an obstacle, but certainly Yone, and I don't think we even hear the plaintiffs in this case to argue otherwise, can't own that general abstract idea. Can I ask you one very brief question about the contract claim? I'm having a little trouble understanding how you read the relationship between produced by it here under and substantially based upon or adapted from in a way that doesn't make the first part of that redundant. Can you explain that? They may be redundant in terms of the application here in the sense that certainly we do argue that the fact that we didn't need any of the rights to the article to make Top Gun Maverick means that they can't satisfy either of the two conditions. However, that doesn't mean that they're redundant in all circumstances. Let me give you an example. The second criteria is substantially based upon the substantially same ideas, etc. as the article. It may be that we created Top Gun Maverick, which I think we can respectfully submit is not substantially based upon the article. However, we may have used some of the protected expression from the article. If we, for example, used as narration some of the actual prose from Yone in Top Gun Maverick, that could be based upon the article in the sense that we bodily appropriated some of the creative expression per the Norell decision. However, it still wouldn't be substantially based upon because we created an entirely new work that's not based on it. We also have paragraph 8, which I would respectfully submit renders actually the discussion about what does paragraph 7 mean, unnecessary in its entirety. With paragraph 8, as I'm sure the Court is aware, the parties confirm that nothing, and that is the language, this is an express override, paragraph 8 overrides everything else in the agreement, that nothing contained in the agreement shall be construed to be or operate in derogation of any rights that Paramount may be entitled to as a member of the public. We thus ask the question, as a member of the public, could Paramount have made Top Gun Maverick without any rights to the article? And the answer to that is indisputably yes. See, I'd read this phrase differently, and so now I'm interested in your answer. The phrase appears in the license. Which phrase? The phrase, paragraph 7, appears in the license. Yes. Right. So let's assume that you didn't produce it under the license, but it was substantially based upon or adapted from the work. This phrase would apply, would it not? You would have to give credit. In that instance, yes. But there was an infringement of the copyright, even though you didn't produce it under the license. So I'd always read, I'd read the second phrase as paralleling the copyright test. If the second work is substantially based upon or adapted from the protected work, which is the article here, then you have obligations. You also have obligations if you produce it under the license. But those seem to me to be two separate obligations. And I agree with you, Your Honor. I thought you were saying something different. Yes, and so I think that in, and I apologize if I was not clear, but what I was trying to say is that the fact that we didn't infringe the copyright could mean and does mean that both the first and the second prongs fail, but it's not necessarily the case because there are other examples like the one I gave where you could satisfy one but not the other and therefore still not have to give credit. So that gets back to the first question Judge Miller asked, I think, which is do you need both? You've got the word and in there, and it seems to me you're really interpreting it as or. I'm interpreting it as and. So you must, see, the difficulty with that is, of course, that when they say we're not producing it under this license that you gave us, we're producing it, you know, we're not, we're doing it independently, and you can sue us for copyright infringement if you want. You're never going to satisfy the first part in a copyright infringement case, are you? Well, I don't think it looks at the, the first prong doesn't look at our subjective view as to whether we're producing it under the license, but whether we're using the rights that, whether the court would find that we're using any of the rights. Well, but you plainly weren't producing it under the license because you had no license to produce Maverick. And thus the copy, unless the credit claim fails, Your Honor, absolutely. So you really, you really are making the first part redundant. I don't, no, I don't agree. I think in this instance, the fact that we didn't use any of the rights renders, it means that they can't satisfy either. But and means and, to be clear. And again, the fact that we can come up with certain scenarios where the same set of facts means that both prongs fail doesn't mean that they're not two, doesn't mean that it's not two. And again, we still have paragraph eight, which instructs, ultimately, again, the override, nothing contained in the agreement. The analysis is whether a member of the public could create Top Gun Maverick without the rights to the article. And the answer to that question is yes. So for all, I will, I'm over my time. So I respectfully request that the district court's decision be affirmed. Thank you. On the contract, it's just totally absurd. The contract runs for 10 pages, and then at the end it says, by the way, we're not giving up any rights the public otherwise has. Obviously, that means rights that are not otherwise specified in the contract. Otherwise, they don't have to pay him the $20,000. He doesn't have to live up to his guarantees. None of all the stuff that happens in the contract matters because you've got this clause at the end saying it doesn't matter. I'm inclined to think that the clause at the end isn't particularly important in interpreting paragraph seven. I'm still having trouble interpreting paragraph seven, and I'm still having difficulty understanding your argument about seven. Paragraph seven is easy. They still have the copyright worldwide. Okay. Assume there's no copyright infringement in this case. Are you entitled to any rights under paragraph seven? Of course. Why? Because we have contract rights. We have contract rights. We gave warranties. We provided exclusivity. So Mr. Yonah couldn't go sell the film. I'm sorry. Any rights that are triggered by the publication, if you will, of Maverick? In other words, let's assume no copyright infringement by Maverick on the article. Are you claiming that you still have some right under paragraph seven because of the publication of Maverick to credits or something? I think the right in question has to be applicable to publication of Maverick because it's something that gets stacked onto the movie. The movie does not get produced. There's nothing to give film credits for. But the contract is a contract. They say if they create a movie, they have to give them credit. And, you know, the district court said, oh, well, it's become nullity because they've revoked the license. But the license revocation only goes to U.S. copyright. It does not go to the worldwide copyright. They've distributed the movie all over the world. So the contract remains in full force except for this revocation. Do you have a sense of the value of the contract claim? I assume it's fairly small relative to the copyright claim. They spent $175 million on this movie, and they made a billion dollars on it. It's just incredibly chintzy of Paramount to instead of do what Congress said, which is to have a fair license negotiated during the exclusivity period, they spent money on armies of expensive lawyers. They spent millions of dollars for enough. Only two, right there. Well, you don't know what's behind them. We've seen the paperwork, and, yes, we're talking about a lot of money. So I guess the question was the relative value of the two claims. The relative value of the two claims, the copyright claim and the – I was just curious, but the copyright claim vis-à-vis the contract claim. Yeah, obviously the copyright claim is more expensive, but clearly also it's a drop in the bucket. The honorable thing for Paramount to do would have been to negotiate just as Congress intended, just as Congress meant for copyright owners to retrieve some value for a work that has risen in value so predominantly. On the expert report, you have to reverse, because there is no filtering for selection and arrangement. We have a selection and arrangement theory. The expert articulated it. We've provided evidence for it. The district court says nothing at all. He says filtration. He didn't filter anything. We think he did filter. I think if you look at it, he did filter as best he could, given that he's talking about articulations about things of facts. And we said in – or you said in Haragami and other cases that sometimes you can't do the filtration just the same way. But he did filter. And I should point out that ours is somebody who actually works in industry. Our expert has written films, has written stories for television, has a career in being a Hollywood insider. As far as I know, he's never done an expert report. He didn't charge for this. He did it – he volunteered because he thinks the injustice – well, I don't want to put thoughts in his mind, but because he was offended by what Paramount did here. And this is going to destroy an industry. This is going to destroy an industry if this is the law in the Ninth Circuit. Movies and shows – If you could wrap up. You are over your time, so if you could – I understand, Judge Miller. Movies and shows that are based on facts are something for which the public has an appetite. And if you say everything – there's no copyright because it's all based on facts, that industry will – I commend – this may be my last word. Thank you. I highly commend the amicus brief by the National Association of Copyright Defense Lawyers. I forget – NACDL. We did not solicit the brief. I had no idea it was coming. We had no involvement in it. But if you want to understand the effect this case – if this case will have on the industry, please, please read that brief. Thank you very much. Thank both counsel. The case is submitted and we are adjourned. All rise. This court for this session stands adjourned.
judges: HURWITZ, MILLER, SUNG